United States Court of Appeals,

Eleventh Circuit.

No. 96-8884.

Bonnie L. ASKEW, Alvin L. Jackson, Sr., Larry G. Morrow, Sr., Committee of Concerned Citizens for the Reappointment of Rome/Floyd County, NAACP of Rome/Floyd County, Plaintiffs-Counter-Defendants, Appellants, Cross-Appellees,

v.

CITY OF ROME, Georgia City Commission, City of Rome Georgia, Defendants-Counter-Claimants-Appellees, Cross-Appellants,

William George Pullen, in his Official Capacity as Chair of the Rome City Commission, City of Rome, Georgia Board of Education, Sandra Burk, in her Official Capacity as Chair of the Rome Board of Education, Defendants-Appellees-Cross-Appellants,

Joan Treglawn, in her Official Capacity as Superintendent of Elections of Floyd County, Georgia, Diane Bojo, John Ware, Esther Vaughn, Defendants-Appellees,

United States of America, Intervenor-Cross-Appellee.

Nov. 14, 1997.

Appeals from the United States District Court for the Northern District of Georgia. (No. 4:93-CV-028), Harold L. Murphy, Judge.

Before BIRCH, Circuit Judge, FAY, Senior Circuit Judge, and COHILL*, Senior District Judge.

PER CURIAM:

The judgment of the district court is affirmed for the reasons set forth in the thorough Order

(opinion) entered on June 25, 1996 and attached hereto as Exhibit A.

AFFIRMED.

ATTACHMENT

APPENDIX

United States District Court,
Northern District of Georgia,
Rome Division.

Bonny L. Askew, et al., Plaintiffs,

---

*Honorable Maurice B. Cohill, Jr., Senior U.S. District Judge for the Western District of Pennsylvania, sitting by designation.

v.

City of Rome, Georgia, et al., Defendants.

Civil Action 4:93-cv-28-HLM.

ORDER

This case came before the Court for a four day non-jury trial on January 29. Plaintiffs contend that the Defendant City of Rome's methods of electing its City Commission and Board of Education are intentionally discriminatory against Rome's African-American community and have the effect of "diluting" the "black vote." They contend, therefore, that Rome's methods violate Section 2 of the Voting Rights Act and several provisions of the United States Constitution. Defendants vehemently disagree. The Court has carefully considered both the testimonial and documentary evidence presented at trial. The Court makes the following findings of fact and conclusions of law.

I. Findings of Fact

A. Parties

1. The individual Plaintiffs—Bonny L. Askew, Alvin L. Jackson, Sr., and Larry G. Morrow, Sr.—are African-American citizens and voters of Rome, Georgia.

2. The organizational Plaintiffs—Committee of Concerned Citizens for the Reapportionment of Rome/Floyd County ["CCCRRFC"] and the NAACP of Rome/Floyd County ["NAACP"]—are organizations composed predominantly of African-Americans who reside in Rome and Floyd County.

3. Defendants are the City of Rome, the Rome City Commission, Chairman of the Rome City Commission William George Pullen, the Rome Board of Education, and Chairwoman of the Rome Board of Education Sandra Burk ("the City Defendants").

4. Election Superintendent of Floyd County Evon Billups and Floyd County Board of Elections members Esther Vaughn, John Ware, and Donna Bojo are also Defendants ("the County Defendants").

2

B. Current Methods of Election

5. Elections for the City Commission and Board of Education are conducted by the Defendant Floyd County Board of Elections. The County Defendants are also responsible for conducting registration for city voters.

6. No direct barriers to black voting exist in Rome.

7. While Rome does not have any official anti-single shot policy, many of the election ballots contain language like "Vote for 3" or "Vote for 7," suggesting that voters must vote for a full slate of candidates. Because of this language, the average voter is more likely to exercise all of her votes than she would otherwise be.

a. City Commission

8. The Rome City Commission consists of nine members elected at-large by plurality vote in non-partisan elections.

9. Three City Commissioners are elected from each of three residency wards in which the Commissioners must reside.

10. In 1990, the wards varied widely in size and population:

| Ward | Total Pop. | % of City Pop. | B Pop. | % B |
|------|-----------|----------------|--------|------|
| Ward 1 | 6,228 | 20.5 | 2,767 | 44.4 |
| Ward 2 | 9,405 | 31.0 | 4,189 | 44.5 |
| Ward 3 | 14,691 | 48.4 | 2,054 | 14.0 |

As a result of the different population sizes of the City Commission residency wards, Ward 1 had less than half the candidate pool of Ward 3.

11. The current system allows Commissioners to be elected to a particular ward seat even though the voters in that ward favored other candidates.

12. The top three vote getters in each of the three residency wards for City Commission are elected.

13. City Commissioners are elected to four year staggered terms. The six members from Wards 1 and 3 are elected at one election, and the three members from Ward 2 are elected at another election two years later.

14. The three current City Commissioners from Ward 2 were elected in 1993 and the six current City Commissioners from Wards 1 and 3 were elected in 1995.

15. When vacancies on the City Commission occur, Commissioners generally appoint someone to fill that position until the next regularly scheduled election for that residency ward.

b. Board of Education

16. The Rome Board of Education consists of seven members elected at-large by plurality vote in non-partisan elections.

17. Board of Education members are elected to four year concurrent terms.

18. There is no residency ward requirement for Board of Education members.

19. The top seven vote getters are elected. Thus, all seven Board of Education members were elected in 1993.

20. When vacancies on the Board of Education occur, Board members generally appoint someone to fill that position until the next regularly scheduled election.

C. Origin and Background of Methods of Election.

21. Between 1847 and 1918, the City Commission operated under several different schemes—having a mayor or first Commissioner with a varying number of council members, alternating between residency and no residency requirements, majority and plurality vote, and staggered and concurrent terms.

22. In 1909, the Board of Education consisted of 5 members elected at large by plurality vote.

23. In 1918, the Georgia legislature adopted a new charter for the Defendant City of Rome which serves as the origin of the City's current election system for both the City Commission and Board of Education.

4

24. The 1918 charter created a seven member City Commission elected at-large to concurrent terms by plurality vote with one Commissioner elected from each of seven residency wards.

25. The 1918 charter created the position of city manager who directed day to day city government.

26. The 1918 charter created a five member Board of Education elected at-large.

27. In 1929, the city charter was amended to increase the number of Commissioners from seven to nine. The amendment added two wards to the Commission to cover newly annexed areas for a total of nine residency wards from each of which one member was elected at-large to concurrent terms by plurality vote.

28. In 1966, the Georgia legislature enacted legislation reducing the number of wards for the Rome City Commission from nine with one member each to three wards with three "numbered posts" in each.

29. Prior to this change, one of the nine wards had a majority of black registered voters, and two other wards were 44 and 46 percent black in population respectively.

30. In 1966, the Georgia legislature enacted legislation adopting a majority vote requirement for primary and general elections for the City Commission and Board of Education.

31. In 1966, the Georgia legislature enacted legislation adopting staggered terms for the City Commission and Board of Education.

32. In 1966, the Georgia legislature enacted legislation increasing the number of members on the Board of Education from five to six and adopted a residency ward requirement for the Board of Education using the same three residency districts adopted for the City Commission with two numbered posts in each ward.

33. In 1970, the Georgia legislature enacted a runoff requirement for City Commission elections in which no candidate received a majority of the vote.

34. In 1971, the Georgia legislature enacted a runoff requirement for Board of Education elections in which no candidate received a majority of the vote.

35. The 1966, 1970, and 1971 election changes were not submitted to the Attorney General of the United States for preclearance under Section 5 of the Voting Rights Act until 1975.

36. Between 1966 and 1974, elections for the City Commission and Board of Education were conducted under the unprecleared systems.

37. In October, 1975, the Attorney General interposed an objection to the majority vote requirement and runoff provisions for both the City Commission and Board of Education, the numbered post and staggered term provisions for the City Commission and Board of Education, and the residency ward requirement for the Board of Education.

38. The Attorney General stated that he could not conclude as required by Section 5 of the Voting Rights Act that these electoral changes "in the context of the at-large elections that presently exist" would not have a racially discriminatory effect.

39. The at-large method of election for the City Commission and Board of Education, as well as the use of residency wards for the City Commission, predated the Attorney General's jurisdiction under Section 5 and, hence, were not subject to Section 5 review.

40. In October, 1975, the Attorney General also interposed an objection to thirteen annexations because he could not conclude that they did not have "a racially dilutive effect on voting in Rome."

41. In 1977, the City of Rome, its city manager, and Chair of the City Commission filed suit in the United States District Court for the District of Columbia ("*Rome I* ") seeking a declaratory judgment that the election changes objected to by the Attorney General complied with Section 5.

42. In *Rome I,* the district court found that the majority vote requirement, numbered posts, and staggered terms for both the City Commission and Board of Education, as well as the residency requirement for the Board of Education, violated Section 5 because they had a facially discriminatory effect.

43. In 1980, the Supreme Court affirmed the district court's decision finding Section 5 objections.

44. Subsequent to the Supreme Court's decision, the Attorney General declined to withdraw his objection to the Defendant City's proposed adoption of residency wards for the Board of Education.

45. Rome complied with the Supreme Court's decision and eliminated the offending practices from its electoral system.

46. In 1983, the City proposed and the Attorney General precleared, a change from concurrent to staggered terms for City Commission.

47. The staggered terms for City Commission were implemented in the 1984 election in which Commission candidates from Wards 1 and 3 were elected for three year terms expiring January, 1988 and those from Ward 2 were elected for five year terms expiring January, 1990.

48. With the adoption of staggered terms, Rome's City Commission election system required twice as many elections as held previously, and twice as many elections as are conducted for the Board of Education.

49. In 1987, the City proposed, and the Attorney General objected to, the adoption of staggered terms for the Board of Education.

50. In 1988, the City proposed, and the Attorney General precleared, legislation increasing the size of the Board of Education from six to seven and setting an election for all Board of Education members in 1988.

51. In 1992, Defendant CCCRRFC, Defendant NAACP and 60 African-American citizens petitioned the Rome City Commission to change the method of election for the Commission and Board of Education because they believed that at-large voting unfairly hindered the black community's ability to elect its favored candidates. In presenting their request for a voluntary change in Rome's methods of election, the citizens committee appeared at a number of City Commission meetings and provided the Commission with a number of proposed district election plans.

7

52. The City had several alternative district election plans drawn by the state legislative reapportionment office.

53. The City also conducted a survey of the election systems used by other cities in Georgia and neighboring states.

54. In January, 1993, the Commission voted to retain the current electoral systems with the exception of eliminating partisan elections.

55. In 1993, the Attorney General precleared a change from partisan to nonpartisan elections for both the City Commission and the Board of Education. This election change was made at the instigation of the City Commission, not as the result of citizen input.

D. Demographics and Geography

a. Population

56. In 1990, Rome's population was as follows:

Total population:       30,326

White population:       20,860

Percentage white:       68.8%

Black population:       9,010

Percentage black:       29.7%

Total voting age population:  23,050

White voting age population: 16,814

Percentage white:       72.9%

Black voting age population: 5,928

Percentage black:       25.7%

57. In 1980, Rome's population was as follows:

Total population:       29,654

White population:       21,230

Percentage white:       71.6%

Black population:     8,220

Percentage black:     27.7%

Total voting age population:  21,712

White voting age population: 16,406

Percentage white:     75.6%

Black voting age population:  5,176

Percentage black:     23.8%

58. In 1970, Rome's population was as follows:

Total population:     30,759

White population:     23,499

Percentage white:     76.4%

Black population:     7,216

Percentage black:     23.5%

Total voting age population:  20,945

White voting age population: 16,590

Percentage white:     79.1%

Black voting age population:  4,355

Percentage black:     20.8%

59. Between 1970 and 1990, the percentage of the total population in Rome that was African-American increased from 23.5 to 29.7%:  an increase of more than six percentage points.

60. Between 1970 and 1990, the percentage of the total voting age population in Rome that is African-American increased from 20.8 to 25.7%:  an increase of nearly 5 percentage points.

b. Registered Voters

61. As of October 31, 1995, the number of registered voters in Rome was as follows:

Total registered voters:     12,971

White registered voters:     10,098

Percentage white:      77.85%

Black registered voters:       2,801

Percentage black:      21.6%

62. As of October 26, 1993, the total number of registered voters in Rome was 11,903, of which 9,382 (78.8%) were white and 2,471 (20.8%) were black.

63. As of September 12, 1989, the total number of registered voters in Rome was 11,339, of which 8,970 (79.1%) were white and 2,347 (20.69%) were black.

64. As of August, 14, 1984, the total number of registered voters in Rome was 12,042, of which 9,692 (80.5%) were white and 2,327 (19.3%) were black.

65. As of 1975, Rome had a total of 13,097 registered voters of which 83.9% were white and 15.5% were African-American.

66. Between 1975 and October, 1995, the percentage of total registered voters in Rome who were African-American increased from 15.5 to 21.6%:  an increase of more than six percentage points and an overall increase of more than 39%.

c. Annexations

67. Including annexations prior to February, 1978 and those between March, 1985 and May, 1993, 4,487 persons have been annexed into Rome, of which 4,218 (94%) are white and 228 (5%) are African-American.

68. Approximately 15% of Rome's total population, 20% of its white population, and 3.2% of its black population reside in annexed areas.

d. Voting Precincts

69. There are currently six voting precincts wholly contained within the city limits of Rome. As of October 27, 1995, the number of persons registered to vote in each of those precincts was as follows:

70. As of October 26, 1993, the number of persons registered to vote in each of those precincts was as follows:

10

71. There are also currently seven voting precincts which lie partially within the city limits of Rome as a result of city annexation.

72. As of October 27, 1995, the number of persons registered to vote in city elections in those split precincts was as follows:

| Precinct | Total | White | Black | Other |
|---|---|---|---|---|
| Alto Park | 240 | 237 | 3 | 0 |
| Etowah | 74 | 60 | 14 | 0 |
| Garden Lakes | 825 | 802 | 18 | 5 |
| East Lindale | 87 | 32 | 55 | 0 |
| Riverside | 8 | 8 | 0 | 0 |
| Chulio | 0 | 0 | 0 | 0 |
| Glenwood | 6 | 6 | 0 | 0 |
| West Lindale | 38 | 38 | 0 | 0 |

73. As of October 26, 1993, the number of persons registered to vote in city elections in those split precincts was as follows:

e. School Zones

74. There are currently eight elementary schools in the Rome School District. Students are assigned to particular schools according to the district in which they live.

75. As of September 3, 1993, the number of students in each of the elementary schools was as follows:

| School | White | % | Black | % | Total |
|---|---|---|---|---|---|
| Anna K. Davie | 11 | | 206 | | 217 |
| East Central | 320 | | 178 | | 498 |
| Elm Street | 204 | | 136 | | 340 |
| Main | 23 | | 294 | | 317 |

North Heights    138      186      324

Southeast    16      183      199

West Central    242      167      409

West End    488      46      534

TOTAL  1,442    1,396    2,838

76. Three of Rome's eight public elementary schools have student bodies which are more than 91% black, and one which is more than 91% white.

77. Approximately 51 percent of the students in the Rome School District are white and 49 percent are black.

f. City and Ward Boundaries

78. Rome has irregularly shaped city boundaries and it appears that the current city boundary splits census blocks.  There are numerous portions of Floyd County which are completely surrounded by city land constituting islands of Floyd County within the city limits of Rome.

79. Geographic compactness has not been a traditional districting criteria for Rome as evidenced by the City's irregular boundaries and its pattern of annexation.  Portions of the City are simply extensions along a highway which are even less than a block wide.

80. Three rivers run through Rome.  The residency ward boundaries trace the rivers' paths.

81. Rome citizens frequently cross bridges to carry on their day-to-day business.

82. The current ward lines used for City Commission include multiple elementary school attendance zones within each ward. People living in the same ward have children attending different schools.  Similarly, the current ward lines include multiple voting precincts within any one ward. People living in the same ward vote in different places.

g. Districting Plans

83. In constructing district election plans for the Rome City Commission and Rome Board of Education, Plaintiffs' expert, Mr. Cooper, attempted to follow traditional redistricting principles such as one person-one vote, contiguity, compactness, and utilizing whole census blocks.  These

12

districting variables interact with each other: any change in one affects others. For example, the one person-one vote requirement affects the district boundary, while shape considerations affect the overall plan deviation. The irregular shape of the City's boundaries affects the shape of the districts drawn by Mr. Cooper. In drawing districts, Mr. Cooper utilized only official data produced by the 1990 census. Mr. Cooper also followed the districting guideline that the overall population deviation within a plan should not exceed 10%.

84. Mr. Cooper used clearly observable boundaries, such as streets used to demarcate census blocks, in constructing districts. There are 749 populated census blocks in Rome. Census block boundaries are defined by the Census Bureau in consultation with local planning officials using clearly observable boundaries.

85. Mr. Cooper's plans and Defendants' plans are described below. The Court finds as fact that these plans are true and accurate representations of possible districting schemes for Rome.[1]

86. Plaintiffs' Exhibit 210 is a nine single-member district plan with a total plan deviation of 8.69%. The plan includes four districts with African-American population majorities of 57.6, 54.6, 55.6, and 62.4%. The black voting age population percentage in these four districts is 51.9, 50.5, 50.1, and 55.7% respectively.

87. Plaintiffs' Exhibit 210A is a nine single member district plan with a total plan deviation of 4.01%. The plan includes three districts with African-American population majorities of 62.6%, 66.0%, and 65.1%. The percent black voting age population in these three districts is 57.0%, 60.2%, and 59.0% respectively.

88. Plaintiffs' Exhibit 61 is a nine single-member district plan drawn for Defendants by the State Reapportionment Office with a total plan deviation of 7.69%. The plan includes three districts

---

[1]In other words, the Court simply finds that these plans are what they purport to be. For example, the Court concludes that if district lines are drawn as they are in Plaintiffs' Exhibit 210, four of the districts would have 57.6, 54.6, 55.6, and 62.4% African-American majorities. The Court does not yet reach the question whether any of the plans are legally sufficient vote dilution remedies.

with African-American population majorities of 71.15, 65.68, and 51.68%. The percent black voting age population in these three districts is 65.75, 59.57, and 46.91% respectively.

89. Plaintiffs' Exhibit 61A is another nine single-member district plan drawn by the State Reapportionment Office for Defendants with a total population deviation of 8.04%. The plan includes three districts with African-American population majorities of 67.18, 67.10, and 52.16%. The percent black voting age population in these three districts is 61.54, 60.82, and 47.25% respectively.

90. Plaintiffs' Exhibit 159B is a three district plan under which three members would be elected from each of three districts, similar to the current ward system. This plan has one three-member district which is 66.6% black in general population and 60.8% black in voting age population. The plan has an overall deviation of 4.55%.

91. Plaintiffs' Exhibit 59 is a three district plan drawn by the State Reapportionment Office for Defendants. This plan has a district which is 63.68% black in general population and 57.57% black in voting age population with an overall deviation of 9.26%.

92. Plaintiffs' Exhibit 209 is a seven district plan which has an overall deviation of 6.42%. The plan includes two districts with African-American population majorities of 70.0 and 69.3%. The voting age population majorities in these two districts are 64.1 and 64.5% respectively.

93. Plaintiffs' Exhibit 60 is a six district plan drawn for Defendants with an overall deviation of 7.48%. The plan includes two districts with African-American population majorities of 64.54 and 61.93%. The voting age population majorities in these two districts are 58.94 and 55.46% respectively.

E. Rome's Voting History

94. Reverend Clyde Hill, a black man, ran unsuccessfully for Rome's Board of Education in 1970. Rev. Hill received the highest number of votes in the general election, but was defeated by one of his white opponents in the run-off necessitated by the majority vote requirement. More

14

Romans voted in the run-off than in the general election. Normally, less people vote in runoffs than vote in general elections.

95. Appointment has been the primary means by which blacks in Rome have initially come to hold office. Five black Romans—Mr. Fielder, Mr. Askew, Ms. Sims, Mr. Carmichael, and Mr. Leggette—have been members of the City Commission or Board of Education since 1980. Of these five, four were appointed. Only one black officeholder on these bodies, Judy Sims, attained public office in the first instance through election.

96. Elgin Carmichael, the first black known to sit on a governing body in Rome, was appointed to the Board of Education in 1975.

97. Mr. Carmichael was elected to the Board of Education in 1980.

98. Napoleon Fielder, the first black known to serve on the City Commission, was appointed in 1980 to a Ward 2 seat.

99. Napoleon Fielder was elected to a Ward 2 seat in 1980, 1984, 1989, and 1993.

100. Bonny L. Askew, an African-American, was appointed to a Ward 2 seat on the City Commission in 1982. He was defeated in his reelection attempt.

101. Judy Sims, an African-American, was elected to the Board of Education in 1984, 1988, and 1993. Ms. Sims was not first appointed.

102. In late 1995, Roy Leggette was appointed to the Board of Education. He has not yet run for reelection.

103. Samuel Burrell, the first black known to serve on the Floyd County Board of Commissioners, was appointed to that body in 1992. In 1994, Samuel Burrell was elected to that post. Mr. Burrell was the favored candidate of both black and white Rome voters.

104. The specific results of Rome elections for City Commission and Board of Education since 1980 in which a black candidate has run are as follows:[2]

---

[2]The following conclusions regarding black and white voting percentages are taken from the analysis of Plaintiffs' expert Dr. Cole. Defendants' expert, however, opined at trial that Dr. Cole's conclusions could not be relied upon because they are based upon insufficient voting data.

| Election/Name of Candidate(s) | % Black Reg. Voting for Cand.(s) | % White Reg. Voting for Cand.(s) | Outcome for Cand.(s) |
|---|---|---|---|
| | | | |
| **1980 Democratic Primary** | | | |
| | | | |
| **City Commission Ward 2** | | | |
| | | | |
| Caldwell | 19 | 19 | 2 |
| Cofield (A-A) | 29 | 4 | 5 |
| Fielder (A-A) | 37 | 18 | 1 |
| Hines | 7 | 12 | 3 |
| Wheeler | 1 | 10 | 4 |

---

The Court concludes that Plaintiffs' expert employed the generally accepted methods of voting analysis—ecological regression analysis, ranking analysis and homogeneous precinct analysis. The Court, therefore, will not discount Plaintiffs' expert's conclusions regarding the percentages of registered voters of each race who voted for particular candidates. The Court recognizes that Dr. Cole's projections may be inaccurate to a certain degree, but their usefulness is due to the pattern of behavior that they demonstrate. This pattern will not be fatally altered if a few of his percentages are somewhat inaccurate. The Court, therefore, accepts Dr. Cole's estimates as true. This is not to say that the Court accepts Dr. Cole's legal conclusions regarding polarization. That determination is for the Court based upon its reading of the relevant law. The Court simply accepts Dr. Cole's numbers.

Furthermore, the Court notes that the percentages listed in the following charts represent the percent of registered voters of a particular race who voted for a particular candidate. This appears to be an unusual statistic to use to gauge bloc voting in voting rights cases. Usually, bloc voting is judged by examining the percentage of *actual* voters of a particular race who voted for a particular candidate. Presumably Plaintiffs' expert employed percent of registered voter numbers because they are more reliable than percent of actual voter numbers. The Court is not concerned by this unusual statistical feature, but simply notes it for purposes of clarity.

Finally, the Court notes that the designation "A-A" next to a candidate's name indicates that she is African American. Those without such designations are white.

1980 General Election

City Commission Ward 2

| | | | |
|---|---|---|---|
| Caldwell (D) | 18 | 22 | 2 |
| Dunwoody (R) | 9 | 22 | 3 |
| Fielder (D)(A-A) | 30 | 23 | 1 |
| Hines (D) | 16 | 14 | 4 |

Board of Education

| | | | |
|---|---|---|---|
| Brewster (R) | 9 | 17 | 6 |
| Bryant (R) | 11 | 18 | 3 |
| Carmichael (D)(A-A) | 24 | 17 | 1 |
| Clark (D) | 3 | 17 | 7 |
| Evans (D) | 12 | 17 | 5 |
| Franklin (D) | 18 | 17 | 2 |
| Gaylor (D) | 11 | 12 | 9 |
| Gould (R) | 9 | 13 | 8 |
| Ham (R) | 8 | 10 | 10 |
| Jones (D) | 22 | 16 | 4 |
| Simmons (R) | 2 | 10 | 11 |

1984 Democratic Primary

City Commission Ward 2

Askew (A-A) 35 7 4

Fielder (A-A) 37 19 1

Fricks 7 22 2

Steinbruegge 6 20 3

City Commission Ward 3

Kennedy 11 22 1

Mitchell 10 22 2

Smith (A-A) 34 7 4

Wade 5 17 3

Board of Education

Bell 3 17 5

Burk 11 20 1

Chapman 5 12 7

Clark 4 20 2

Crider 2 11 8

Greer 4 15 6

Jones 19 16 4

Milam 1 7 10

Morrow (A-A) 27 5 9

Sims (A-A) 33 13 3

1984 General Election

City Commission Ward 2

| | | | |
|---|---|---|---|
| Bratcher (R) | 0 | 6 | 5 |
| Dunwoody (R) | 5 | 13 | 4 |
| Fielder (D) (A-A) | 20 | 16 | 1 |
| Fricks (D) | 8 | 17 | 2 |
| Steinbruegge (D) | 7 | 15 | 3 |

Board of Education

| | | | |
|---|---|---|---|
| Bell (D) | 8 | 18 | 5 |
| Burk (D) | 12 | 20 | 1 |
| Clark (D) | 6 | 20 | 2 |
| Glover (R) | 0 | 11 | 7 |
| Greer (D) | 4 | 20 | 6 |
| Jones (D) | 9 | 20 | 3 |
| Sims (D) (A-A) | 15 | 17 | 4 |

1987 Democratic Primary

City Commission Ward 3

| | | | |
|---|---|---|---|
| Kennedy | 10 | 7 | 1 |
| Mitchell | 9 | 7 | 2 |
| Smith (A-A) | 17 | 2 | 4 |

Wade    3    6    3

1988 General Election

Board of Education

Bell    25    38    3

Burk    23    41    1

Burnes        13    32    8

Clark    21    37    5

Greer    18    35    6

Holland (A-A)        38    17    9

Jones    25    37    4

Perry    4    23    10

Sims (A-A)    39    35    2

Swann    2    40    7

1989 Democratic Primary

City Commission Ward 2

Fielder (A-A)    21    8    1

Fricks    9    9    2

Holland (A-A)        18    1    4

Steinbruegge    7    8    3

1993 Democratic Primary

City Commission Ward 2

| | | | |
|---|---|---|---|
| Askew (A-A) | 8 | 4 | 3 |
| Fielder (A-A) | 10 | 6 | 1 |
| Fricks | 7 | 6 | 2 |

Board of Education

| | | | |
|---|---|---|---|
| Burk | 8 | 5 | 7 |
| Clark | 9 | 5 | 4 |
| Greer | 8 | 6 | 3 |
| Horton | 8 | 5 | 6 |
| Jernigan | 4 | 5 | 8 |
| Lightfoot | 9 | 5 | 5 |
| Sims (A-A) | 10 | 5 | 1 |
| Swann | 8 | 6 | 2 |

1993 General Election

City Commission Ward 2

| | | | |
|---|---|---|---|
| Askew (D) (A-A) | 28 | 5 | 5 |
| Doss (R) | 10 | 13 | 3 |
| Fielder (D)(A-A) | 32 | 13 | 1 |

Fricks (D)      22      14      2

Norman (R)      5      13      4


Board of Education

Burk (D)      23      13      4

Burnham (R)   9      12      9

Clark (D)      26      14      3

Greer (D)      23      14      5

Horton (D)     23      12      8

Lightfoot (D)  27      12      6 (tie)

Sims (D) (A-A)        33      14      1

Smith (R)      10      16      6 (tie)

Swann (D)      25      15      2


1995 General Election


City Commission Ward 3

Doster  0      12      4

Griffin      8      14      1

Leonard      3      15      3

McClure (A-A)        7      7      5

Toles   0      8      6

Wallace      4      15      2

Williams (A-A)        10      5      7

105. The results of Rome's City Commission elections from 1980 through 1993 in which no black candidate ran are as follows:[3]

| Election/Name of Candidate(s) | % Black Reg. Voting for Cand.(s) | % White Reg. Voting for Cand.(s) | Outcome for Cand.(s) |
|---|---|---|---|

1980 Democratic Primary

City Commission Ward 1

| | | | |
|---|---|---|---|
| Hanson | 19.1% | 15.4% | W |
| Harrington | 20.6 | 15.2 | W |
| Pullen | 23.4 | 11.1 | W |
| Wilson | 16.7 | 8.4 | L |

City Commission Ward 3

| | | | |
|---|---|---|---|
| Duke | 6.1 | 3.5 | L |
| Kennedy | 23.0 | 11.0 | W |
| Mitchell | 13.7 | 13.4 | W |
| Newton | 20.2 | 7.4 | L |
| Phillips | 11.9 | 6.8 | L |

---

[3]The forgoing statistics were derived from Plaintiffs' expert's analysis of elections in which black candidates participated. The following statistics, in contrast, were derived from Defendants' expert's analysis of elections in which no black candidate participated. For purposes of clarity, the Court simply notes that Defendants' expert did not rank the candidates by order of finish. Instead, he simply noted which candidates won the election. In the fourth column below, therefore, the Court uses the letters "W" and "L" to indicate who won and lost, rather than the numbers used above to indicate order of finish.

Wade   12.3    13.1    W

1980 General Election

City Commission Ward 1

Callan (R)       5.0%  15.8%  L
Hanson (D)     24.7    10.0    W
Harrington (D)          17.8    15.6    W
Morris (R)      8.1     15.7    L
Pullen (D)      19.3    13.0    W

City Commission Ward 3

Kennedy (D)   23.8    20.0    W
Mitchell (D)   20.0    19.9    W
Wade (D)       16.0    20.5    W

1984 General Election

City Commission Ward 1

Hanson (D)     11.1%  16.3%  W
Harrington (0)          10.7    16.8    W
Pullen (D)      15.5    17.0    W
Williams (R)    3.0     5.5     L

City Commission Ward 1

Kennedy (D)   11.7    19.3    W

Mitchell (D)   9.2     18.2    W

Wade (D)       7.8     17.2    W

1991 General Election

City Commissioner Ward 1

Hanson        11.6%  15.2%  L

Harrington    10.7    16.0    W

Pullen  12.8   16.4    W

Smith   15.2    21.0    W

City Commissioner Ward 3

Griffin        17.2    19.4    W

Kennedy        16.8    19.7    W

Laseter        5.6     14.2    L

Wade   11.9    16.0    W

106. No African-American has run for one of the three Ward 1 City Commission seats.

107. The number of African-Americans currently holding office on Rome's local governing bodies is identical to the number in 1980:  one on both the City Commission and Board of Education.

108. The percentage of candidates for Rome's governing bodies who are black is lower than the percentage of Rome's population that is black—i.e. lower than roughly 30%.

109. The most important factor determining whether individuals run for elected office is whether they believe they will be successful.

110. Some black citizens who are interested in running for local office have not run because they believe they cannot win under Rome's present electoral systems. A change in the method of elections to single-member districts with some majority black districts would increase the number of black candidacies for local office.

111. Some Black citizens believe their votes do not affect the outcome of local elections. This sense of a "lack of political efficacy" causes some black voters to eschew political involvement.

112. In 1995, Reverend Ingram, a black leader in Rome, publicly endorsed candidate Wallace who was running for City Commission Ward 3. Mr. Wallace is white. The endorsement was targeted at attracting the votes of black voters.

113. In the past, some informal "tickets" have been formed for particular Rome elections. No black candidates have been included in any of these tickets. These "tickets" have been infrequently formed, however, because all Board of Education candidates and all City Commission candidates from a particular ward run against each another. None of the tickets were formed by any formal political party.

114. The cost of campaigning and being elected in Rome is increasing. Running at-large citywide costs more than running from a single-member district. In the 1990s, Commissioners have spent $5,000 or more to be elected.

115. Plaintiff Askew is articulate and bright, but did not campaign hard in the white community in his election attempts. The Court also notes the following portion of his testimony:

> A. [Black Romans] have seen what happens in this community when someone stands up. That's why Mr. Fielder sits down and doesn't address black issues. That's why Ms. Sims doesn't address black issues, because if they did, they wouldn't be there anymore.
>
> ...

26

Q. You know that politics is a compromise situation everywhere, isn't it?

A. I don't compromise my integrity, Mr. Brinson.

...

Q. Don't you think that you have to pull, and tug, and bargain, and give up, some give and take?

A. But you've got to stand up, Mr. Brinson, you've got to stand up.

...

A. You can't lay down, let people run over you and that's basically what happens in [the black] community, because we feel like we have no other hope.

...

A. [I]f *my* people turn out, then *your* people turn out. And if *your* people turn out, I can't win.

From this testimony, the Court concludes that Mr. Askew views Rome's white and black communities as in conflict with one another.

116. Mr. Holland did not "run hard" in either of his campaigns.

117. Rome's residency wards reduce the effectiveness of single-shot voting by reducing the number of seats in each election. For example, the City Commission involves three separate elections for three members each, instead of one election for nine members.

118. Rome's practice of staggering City Commission elections increases the frequency of city elections. This has a depressing effect on both black and white voter turnout.

F. Socioeconomic Disparities

119. As of 1989, per capita income for white persons in Rome was $14,263; per capita income for African-Americans in Rome was $6,798.

120. As of 1989, 12.22% of white persons (2,375) had income below poverty level; 33.47% of African-Americans (2,955) had income below poverty level.

121. Of the 5,470 white families in Rome in 1989, 843 (15.41%) were female-headed households with no husband present. Of the 2,341 black families in Rome, 1,133 (48.4%) were female-headed households with no husband present.

27

122. Of the 9,744 white persons sixteen years and over in the labor force in Rome in 1989, 499 (5.12%) were unemployed. Of the 4,038 black persons sixteen years and over in the labor force, 525 (13.00%) were unemployed.

123. Of the 14,649 white persons in Rome who were 25 years and over in 1989, 40.72% (5,965) attended some college or received a college or graduate or professional degree, 13.51% (1,979) were college graduates, and 8.01% (1,174) had graduate or professional degrees. Of the 4,952 black persons in Rome who were 25 years and over, 19.14% (948) attended some college or received a college or graduate degree, 3.19% (158) were college graduates, and 2.18% (108) had graduate or professional degrees.

124. Of 3,168 housing units occupied by African-Americans in 1989, 1,129 (35.64%) were owner-occupied and 2,039 (64.36%) were renter-occupied. Of 8,757 housing units occupied by whites, 5,021 (57.34%) were owner-occupied and 3,739 (42.66%) were renter-occupied.

125. Of 8,757 white occupied housing units in 1989, 1,101 (12.57%) had no vehicle available. Of 3,168 black occupied housing units, 984 (31.06%) had no vehicle available.

126. The percentage of the City's workforce which is black has declined by more than one-quarter in the past 20 years, from 21.8% in 1973 to 15.9% in 1993. The City's black population has increased during that period from 23.5 to nearly 30%.

127. The current black public employment rate has fallen even lower. As of January, 1996, the Defendant City of Rome employed 687 persons of which minorities comprised only 12%.

128. Similarly, the percentage of new city employees who were black decreased from 37.9% in 1974 to 14.0% in 1993.

129. In 1993, 61.3% of all black city employees (57 of 93 persons) earned $19,900 or less, whereas 45.2% of all white city employees (221 of 489 persons) fell in this category.

130. In 1993, 46.2% of all black city employees (43 of 93 persons) were employed in the service/maintenance job category, whereas 25.4% of all white city employees (124 of 489 persons) were employed in this job category.

28

131. In 1993, 11.8% of all black city employees (11 of 93 persons) were employed in the protective service job category, whereas 40.9% of all white city employees (200 of 489 persons) were employed in this job category.

132. Between 1984 and 1992, the percentage of blacks employed by the Rome public schools as teachers decreased from 17.9% (49 of 273) to 9.2% (23 of 250).

133. Between 1984 and 1992, while the total number of faculty and staff in the Rome schools increased, the percentage of blacks on the faculty and staff decreased from 18.1% (55 of 304) to 13.4% (48 of 358.5).

134. Between 1986 and 1992, while the total number of persons employed by the Rome City School District increased, the percentage of the total school workforce that was black decreased from 23.3% (102 of 437) to 19.2% (98 of 510).

135. In 1986, the school district hired a total of 66 new employees of which 15 (22.7%) were black, whereas in 1992, a total of 26 new employees were hired, of which 1 (3.8%) was black. Similarly, in 1986, the school district hired a total of 33 new teachers of which 4 (12.1%) were black, whereas in 1992, a total of 14 new teachers were hired, of which none were black.

136. In comparison to some other cities and communities with significant black and white populations in Georgia, however, the aforementioned socio-economic disparities are not particularly large.

G. Voter Registration

137. In 1995, 47.25% of age eligible blacks were registered to vote whereas 60.1% of age eligible whites were registered to vote: a racial registration rate differential of 12.85%.

138. Throughout the 1980s and 1990s there has been a consistent 12 to 14% voter registration rate differential between blacks and whites.

139. People with low socioeconomic status register to vote and turn out to vote in lower percentages than people in higher socioeconomic categories.

H. Residential and Social Segregation

140. Rome's social organizations and churches continue to be largely segregated by race.

141. Nearly three quarters of Rome's black population (72.04% or 6,491 persons) lives in majority black census blocks, and nearly one-half of the black population (45.25% or 4,077 persons) resides in census blocks that are 90% or more black.

142. 94% of Rome's white population lives in majority white census blocks, and 57% of the white population resides in census blocks that are 90% or more white.

143. In 1990, more than 76% (6,908/9,010) of Rome's total black population resided in the North Rome, South Rome, and East Rome precincts, whereas only 12.8% (1,152/9,010) of Rome's total black population resided in the Town Rome, Mount Alto One and Mount Alto Two precincts.

144. In 1995, two of the six city precincts (Mount Alto South and Town Rome) had more than 90% white registered voters, one (Mount Alto North) had nearly 85% white voter registration, two (East Rome and North Rome) ranged from approximately 60 to 75% white voter registration, and one (South Rome) was approximately 63% black.

145. Data as recent as August 8, 1995 demonstrates that much of the public housing in Rome continues to be essentially segregated on the basis of race.

146. As of August 8, 1995 there were 1033 persons residing in projects operated by the Rome Housing Authority of which 479 were white, 547 were black, and 7 were of other races. Of these, 84.8% of the white residents (406 persons) lived in projects which were 80% or more white in population and 69.0% of the black residents (380 persons) lived in projects which were 95% or more black in population.

147. Eight (8) of the ten (10) public housing projects operated by the Rome Housing Authority have resident populations which are more than 93% black or white, and 1 of the 10 is more than 80% white. Three of the projects have resident populations which are more than 93% white, while 5 of the projects have resident populations which are more than 95% black.

148. These same eight public housing projects which today are more than 93% black or white had resident populations in 1980 which were more than 98% black or white.

30

I. Race Related Governmental Action

149. In the late 1950s, the state legislature enacted laws continuing restrictions adopted in the 1940s requiring all election officials in Georgia to purge voter lists, conduct voter registration only at specifically designated stationary locations, and impose a voter registration requirement of passing a literacy test or test of "good character" and "understanding the duties and responsibilities of citizenship under a republican form of government." The Georgia Constitution of 1976 carried forward the literacy test combined with a "good character and understand[ing]" test. These laws were applicable to Rome election officials as well as all other election officials in the state of Georgia.

150. During the 1950s, Rome maintained separate public swimming pools, baseball fields, and cemeteries segregated on the basis of race.

151. Into the 1960s, Rome maintained separate public libraries segregated on the basis of race.

152. In 1980, the Georgia Department of Natural Resources found evidence of discrimination by Rome in the maintenance and programming in a city park located in a minority neighborhood.

153. The Rome City schools were segregated until 1972 and were desegregated only as a result of litigation by the federal government in *United States and Ridley v. State of Georgia, Rome City School District,* No. 1:69-CV-2972 (N.D.Ga.1969).

154. The Rome school district has never been declared unitary and today continues to operate under a desegregation order.

155. In August, 1994, the United States Department of Education determined that four elementary schools did not meet the definition of integrated facilities in this Court's desegregation order, and were therefore racially identifiable.

156. In August, 1994, the United States Department of Education determined that the Rome school district does not meet the definition of an integrated school district because only 69% (rather than 75%) of the black students attend integrated facilities.

157. The Department of Education also found that ability grouping and class assignment practices utilized in some of Rome's schools had resulted in racially identifiable and racially isolated classes.

158. As of May 19, 1995, the Department of Education found that 19 of 120 classes (18%) at the Rome Middle School were racially identifiable and that two accelerated classes at the Elm Street Elementary School were racially identifiable. While the Department of Education found numerous racially identifiable classes at Rome High School, as of May 19, 1995, the Department had not made a determination regarding the school district's current compliance status.

159. Rome's current white governing officials are not racists. No evidence exists, moreover, indicating that there have been any racists on the City Commission or Board of Education within the last 16 years.

160. Many members of the City Commission sincerely believe that the at-large election system is best for the future of Rome because each governing official feels a responsibility to represent every citizen. They also believe residency wards to be good policy because they ensure members of the Commission are familiar with all areas of the City. Even Mr. Fielder supports the current system.

161. None of the decisions by Rome's white governing officials to appoint black Romans to the City Commission and Board of Education constituted an attempt to avoid the reach of the Voting Rights Act. Rome's elected officials were simply motivated by a desire to achieve racial diversity on Rome's elected bodies.

162. Rome's current governing bodies are responsive to the black community's needs.

163. Testimony by Plaintiffs' witnesses at trial indicates that Ms. Kennedy, Ms. Burk, Ms. Lightfoot and Ms. Clark are supported by the black community and have been at least "satisfactory" representatives of their interests. The Court concludes that this testimony is accurate and, in fact, understates their effectiveness in representing the black community's needs.

II. Conclusions of Law

32

164. Plaintiffs, African-American citizens and registered voters of the City of Rome, contend that Rome's at-large method of electing its City Commission and Board of Education violates the First, Thirteenth, Fourteenth and Fifteenth Amendments of the Constitution and Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (hereinafter "Section 2").

A. The Constitutional Claims and Section 2's "Purpose" Standard

165. Plaintiffs' statutory claim under Section 2 may be established by proof that the challenged methods of election either have a discriminatory purpose *or* effect. *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Plaintiffs' constitutional claims under the Fourteenth and Fifteenth Amendments require proof of racially discriminatory purpose *and* effect. *Hunter v. Underwood,* 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985); *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982).[4]

166. The House and Senate Reports accompanying the 1982 amendments to the Voting Rights Act adopt the standard for proving discriminatory purpose established in *Village of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 264-68, 97 S.Ct. 555, 562-65, 50 L.Ed.2d 450 (1977). According to the Senate Report:

> Plaintiff may establish discriminatory intent for purposes of this section through direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions which "is one type of quite relevant evidence of racially discriminatory purpose."

S.Rep. No. 417, 97th Cong., 2d Sess. 27, n. 108 (1982), reprinted in 1982 U.S. Code Cong. & Admin. News 177. The House Report provides that:

> Plaintiffs would not be required to prove that a discriminatory purpose was the sole, dominant, or even the primary purpose for the challenged practice or procedure, but only that it has been a motivating factor in the decision.

_____

[4]As noted above, Plaintiffs assert in their Complaint that their voting rights are also protected under the First and Thirteenth Amendments. Plaintiffs, however, have not even taken the time to set forth proposed findings of fact and conclusions of law on these claims. The Court, therefore, concludes that Plaintiffs have abandoned these claims and that it need not examine them here. To be thorough, however, the Court notes that Plaintiffs have not proven a claim under either Amendment.

H.Rep. No. 227, 97th Cong., 1st Sess., at 30, n. 101. "[R]acial discrimination is not just another competing consideration." *Id.,* at 265-66, 97 S.Ct. at 563-64. "Discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the legislative choice or it is not." *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 277, 99 S.Ct. 2282, 2295, 60 L.Ed.2d 870 (1979).

167. Once intent is shown, it is not a defense under the Voting Rights Act that the same action would have been taken regardless of the racial motive. *Richmond v. United States,* 422 U.S. 358, 378, 95 S.Ct. 2296, 2307, 45 L.Ed.2d 245 (1975) ("An official action ... taken for the purpose of discriminating against Negroes on account of their race has no legitimacy at all under our Constitution or under the statute.").

168. Direct evidence of intent, moreover, is not required where at-large elections are challenged as being maintained for discriminatory purposes: "Clearly, the right to relief cannot depend on whether or not public officials have created inculpatory documents." *Lodge v. Buxton,* 639 F.2d 1358, 1373 (5th Cir.1981), *aff'd sub nom. Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982).

169. Plaintiffs attempt to prove Defendants' discriminatory intent through evidence of the electoral system's alleged dilutive effect. While use of such circumstantial evidence is permissible for this purpose in some circumstances, the Court does not find it persuasive in the instant case. Instead, the Court is influenced by several other factors. First, Plaintiffs have produced no credible evidence that Rome's system was established for discriminatory purposes. Second, the evidence indicates that Rome's current white governing officials are not racists. To the contrary, they are responsive to the black community, and, in fact, many are supported by the black community. Third, the Court is convinced that many members of the City Commission sincerely believe that the at-large election system is best for the future of Rome. Fourth, the Court notes that none of Rome's black elected officials object to the current system or attribute any discriminatory motive to Rome's white City Commissioners. For these reasons, the Court concludes that Rome's current electoral

34

systems were not established and are not maintained for discriminatory purposes. Plaintiffs' Constitutional claims, and the "purpose" portion of their Section 2 claim, fail.

B. The Section 2 Results Test

a. The Law

170. Section 2 of the Voting Rights Act prohibits "voting ... standard[s], practice[s], or procedure[s] ... which result[ ] in the denial or abridgement of the right of any citizen ... to vote on account of race." 42 U.S.C.A. § 1973(a) (West 1994). A Section 2 violation, moreover, is established:

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by [minorities] in that [their] members have less opportunity than other members of the electorate to participate in the political process and to elect representative[s] of their choice. The extent to which members of a protected class have been elected to office in the state or political subdivision is one circumstance which may be considered: *Provided,* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973(b) (West 1994).

171. "The essence of a § 2 claim is that a certain electoral law ... interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles,* 478 U.S. at 46-47, 106 S.Ct. at 2764. "The theoretical basis for this type of impairment is that where minority and majority voters *consistently* prefer different candidates, the majority, by virtue of is numerical superiority, will regularly defeat the choices of minority voters." *Id.* at 48, 106 S.Ct. at 2765 (emphasis added). "Not only does voting along racial lines deprive minority voters of their preferred representative in these circumstances, it also allows those elected to ignore [minority] interests without fear of political consequences, leaving the minority effectively unrepresented." *Id.* at 48 n. 14, 106 S.Ct. at 2765 n. 14 (citations and internal quotations omitted).

172. At-large election schemes, like the one at issue, are not violative of Section 2 *per se.* Rather, at-large elections only violate Section 2 when "a bloc voting majority [is] *usually* ... able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Id.*

35

at 49, 106 S.Ct. at 2766. In other words, the Supreme Court has held that there are three prerequisites to a successful vote dilution claim:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates. Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multi-member electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, ... usually to defeat the minority's preferred candidate. In establishing this last circumstance, the minority group demonstrates that submergence in a white multi-member district impedes its ability to elect its chosen representatives.

*Id.* at 50-51, 106 S.Ct. at 2766-67 (citations omitted) (hereinafter known as "the three *Gingles* prerequisites").[5]

173. If Plaintiffs can satisfy these prerequisites, they will sometimes have carried their ultimate burden of demonstrating "based on the totality of circumstances," that members of Rome's African-American community "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C.A. § 1973(b) (West 1994). Depending on the specific circumstances at issue, however, the three *Gingles* prerequisites may not be sufficient by themselves to prove vote dilution. In such a case, any number of other showings will also be relevant. Some of these factors are as follows:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> ....
>
> [2]. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provision, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> [3]. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

---

[5]The Supreme Court also noted that "the usual predictability of the majority's success distinguishes structural dilution from the mere loss of an occasional election." *Id.* at 51, 106 S.Ct. at 2767.

36

[4]. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

[5]. whether political campaigns have been characterized by overt or subtle racial appeals;

....

[6.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[;]

[7.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 36-37, 106 S.Ct. at 2759-60.

174. District courts must not forget, moreover, that:

[i]n evaluating a statutory claim of vote dilution through districting, the trial court is to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters. This determination ... requires an intensely local appraisal of the design and impact of the contested electoral mechanisms.

*Id.* at 79, 106 S.Ct. at 2781 (citations and internal quotations omitted).

b. Application of the Law

i. The First *Gingles* Prerequisite:  Minority Numerosity and Geographical Compactness

175. As indicated by Plaintiffs' plans, it is possible to draw three single member districts in which African-Americans comprise a majority of the voting age population in a nine district scheme. Plaintiffs' plans also demonstrate the possibility of drawing districts in which African-Americans are the majority of the voting age population in two out of seven single member districts.  The aforementioned districts could be drawn in a manner (1) consistent with *Gingles'* requirement that they be geographically compact and (2) in compliance with the one person-one vote requirement. *Brown v. Thomson,* 462 U.S. 835, 842-843, 103 S.Ct. 2690, 2695-96, 77 L.Ed.2d 214 (1983). Though none of Plaintiffs' proposals is a completely satisfactory remedy, Plaintiffs' Exhibit 210A comes closest to satisfying the Court's concerns.[6]  The Court's compactness conclusion is also

---

[6]At first glance, Plaintiffs' plans appear contorted, but much of this impression is given by the city's irregular boundaries and the fact that several "islands of Floyd county" exist within the city limits.  The fact that Rome's pattern of annexations has rendered the city unshapely has no

bolstered by the fact that Rome's school attendance zones result in half of the elementary schools having student populations over either 90% white or 90% black. In fact, three of eight elementary schools in Rome have student bodies which are more than 90% black, and these schools reflect the racial demographics of the neighborhoods in which they are located. The Court concludes, therefore, that Rome's African-American community is sufficiently numerous and compact that it satisfies the first *Gingles* prerequisite.

176. Before turning to the next *Gingles* factor, the Court pauses briefly to consider Defendants' argument that *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) and its progeny impact this case. This line of cases establishes that the Equal Protection Clause is implicated, and strict scrutiny must be applied, whenever racial considerations predominate over traditional districting principles in a state's districting scheme. *See Shaw v. Hunt,* --- U.S. ----, 116 S.Ct. 1894, 135 L.Ed.2d 207, (1996); *Bush v. Vera,* --- U.S. ----, 116 S.Ct. 1941, 135 L.Ed.2d 248, (1996). Assuming for the moment that this holding theoretically places new limits on this Court's ability to compose a remedial plan in this case and assuming that upon further consideration the Court determines that a remedial plan can not be composed in this case that is entirely consistent with traditional race-neutral districting principles, the Court concludes, nonetheless, that the Court could fashion a constitutional districting plan in this case. This is so because eliminating violations of Section 2 is a compelling state interest. Even under this modified *Shaw* framework, therefore, the Court's only requirement would be to narrowly tailor its remedy to the goal of eliminating a Section 2 violation. Even in the absence of *Shaw* and its progeny, the Court would have labored to eliminate vote dilution in the manner that least disrupted Rome's chosen electoral system and its

---

bearing on whether Rome's minority population is compact within the meaning of *Gingles.*

      The Court also notes that Rome's boundaries indicate that geographic compactness has not been a particularly important districting criteria for Rome. For example, portions of the City are simply extensions along a highway which are even less than a block wide.

districting principles. *Shaw,* therefore, has little practical relevance to this case.[7] *See generally, Shaw,* --- U.S. ----, 116 S.Ct. 1894, 135 L.Ed.2d 207; *Bush,* --- U.S. ----, ----, 116 S.Ct. 1941, 1960-61, 135 L.Ed.2d 248 ("we assume without deciding that compliance with the results test ... can be a compelling state interest. We also reaffirm that the "narrow tailoring' requirement of strict scrutiny allows the states a limited degree of leeway in furthering such interests. If ... the district that is based on race "substantially addresses the Section 2 violation, it satisfies strict scrutiny. We thus reject, as impossibly stringent, the ... view of the narrow tailoring requirement ... that a district must have the least possible amount of irregularity in shape, making allowances for traditional districting criteria. A Section 2 district that is reasonably compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries, may pass strict scrutiny without having to defeat rival compact districts designed by plaintiffs' experts in endless beauty contests.").

ii. The Second and Third *Gingles* Prerequisites: Minority Political Cohesion And White Majority Bloc Voting

177. "Because the extent of bloc voting necessary to demonstrate that a minority's ability to elect its preferred representative is impaired varies according to several factual circumstances, the degree of bloc voting which constitutes the threshold of legal significance will vary from district to district." *Gingles,* 478 U.S. at 55, 106 S.Ct. at 2769. In general, however:

> [a] showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim ... and, consequently, establishes minority bloc voting within the context of § 2. And, in general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting.

*Id.* at 55-58, 106 S.Ct. at 2768-70.

---

[7]The Court notes, moreover, that Rome's only discernable districting principle appears to be a desire not to have any political subdivision divided by one of Rome's rivers. Rome's three rivers are the boundaries of its three residency wards, yet these wards are dissimilar in population and geographic area. Keeping precincts intact, moreover, has not been a particularly important districting criteria for Rome as there are more precincts split by the city boundary than there are whole precincts within the city limits.

178. To begin, the Court concludes that both empirical and anecdotal evidence indicate that Rome's black community is "cohesive." The black community consistently ranks black candidates as their favorite candidates. Testimony also revealed that Rome is a largely segregated society in which whites are somewhat more affluent and better educated than blacks. These facts are more than sufficient to support the inference that Rome's African-American community is legally cohesive with distinctive wants and needs. *See id.* at 58-59, 106 S.Ct. at 2770-71 ("The District Court's findings concerning black support for black candidates in the five multi-member districts at issue here clearly establish the political cohesiveness of black voters."). Plaintiffs, therefore, have satisfied the second *Gingles* prerequisite.

179. In order to determine whether a bloc voting white community usually defeats black preferred candidates, the Court must determine who can truly be counted as a "black preferred candidate" in the instant case.[8] Plaintiffs contend that the black community's candidates of choice are all those who have run for office who are black. Indeed, as noted above, every black Roman to have run for the City Commission or the Board of Education has been strongly supported by the black community. All but one have been preferred by the black community more than every other white candidate to have run against them. The Court concludes, therefore, that every black candidate to have run for the aforementioned offices can fairly be considered to be a black preferred candidate for purposes of this analysis. Defendants do not seriously contest this conclusion.

180. Defendants, however, note that African-Americans have not voted solely for black candidates and, in fact, have cast significant numbers of votes for white candidates in Rome's city elections. Defendants contend, therefore, that those white candidates for whom African-American

---

[8]In order to ensure that this Order generates no confusion, the Court notes that its use of the terms "black candidate" and "white candidate" refers solely to the race of the candidate himself. The Court's use of the terms "black preferred candidate" and "white preferred candidate" refers to a candidate—of whatever race—preferred by the black electorate and white electorate respectively. In its efforts to explain that not all candidates who are voted for by the black community are truly "black preferred candidates", moreover, the Court also occasionally makes use of the phrases black or white "favored candidate." The Court defines a black or white "favored candidate" to be one that would have been elected by the black or white communities if they alone had voted in a particular election.

Romans have voted should be counted as black preferred candidates. Plaintiffs disagree. Plaintiffs note that Rome's ballots usually contain language suggesting that voters must vote for three City Commissioners from each ward and seven Board of Education members. Plaintiffs note, furthermore, that Rome's black community has never had the opportunity to vote for a full slate of black candidates because few black Romans have offered for office. This, in turn, is allegedly so because potential black candidates believe that the current system is so dilutive that they cannot win. Plaintiffs contend, therefore, that they have been forced to vote for white candidates who are not truly black preferred and urge the Court to examine only black candidacies when calculating whether white bloc voting usually defeats black preferred candidacies.

181. The Court does not accept either party's position. The Court will not automatically assume that the black community can only be satisfied by black candidates. *See Johnson v. DeGrandy,* 512 U.S. 997, 1027, 114 S.Ct. 2647, 2665, 129 L.Ed.2d 775, 801 (1994) (Kennedy, J., concurring) ("The assumption that majority-minority districts elect only minority representatives, or that majority-white districts elect only white representatives, is false as an empirical matter. And on a more fundamental level, the assumptions reflect "the demeaning notion that members of the defined racial groups ascribe to certain "minority views" that must be different from those of other citizens'."); *Nipper v. Smith,* 39 F.3d 1494, 1540 (11th Cir.1994) (*en banc*) (2 Judge portion of majority opinion) (holding that white on white elections are probative of racial polarization and, therefore, implicitly holding that some white candidates can be truly "black preferred"), *cert. denied,* 514 U.S. 1083, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995); *S.C.L.C. v. Sessions,* 56 F.3d 1281, 1293-94 (11th Cir.1995) (*en banc*) (affirming trial court's consideration of all relevant evidence including white on white elections), *cert. denied,* --- U.S. ----, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996).

182. On the other hand, the Court will not automatically assume that every white candidate who has been voted for by the black community is truly satisfactory to the black community. The Court concludes that some potential black candidates do believe they cannot win election under the current system. Both the testimony of Plaintiffs' witnesses and the disproportionately low number

41

of black candidacies support this finding. Thus, the black community's electoral choices may have been limited, and they may have been forced to vote for white candidates whose views and character were not satisfactory. *Nipper,* 39 F.3d at 1541 ("In holding as we do, ... we do not foreclose the consideration of electoral races involving only white candidates where the record indicates that one of the candidates was *strongly preferred* by black voters."). Some, but not all, white candidates who have received black votes are "black preferred."

183. Black preferred candidates, moreover, are not only those who are perfectly ideologically in tune with the prevailing political sentiment in the black community. To so hold would, to start with, raise the possibility that none of Rome's current black officials were truly black preferred because they are too moderate in their views. Such a result cannot have been intended by Congress. The idea that black preferred candidates must be perfectly ideologically aligned with the mainstream black community would also render the third prong of the *Gingles* test meaningless. This is so because if the black community is (1) found to be cohesive with its own distinct needs and (2) black preferred candidates must represent those needs without regard for the white community, the white community is quite naturally going to vote against the black preferred candidates almost every time. Again, this cannot have been Congress's intention. Six members of the Supreme Court, moreover, have endorsed the view that:

> [i]f the lesson of *Gingles* is that society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice. Those candidates may not represent perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics.

*Johnson,* 512 U.S. at 1020, 114 S.Ct. at 2661, 129 L.Ed.2d at 796; *see Nipper,* 39 F.3d 1494 (quoting the above passage in the context of determining who may truly be considered "black preferred"); *S.C.L.C.,* 56 F.3d at 1293-94 (*en banc* decision affirming district court decision that no Voting Rights Act violation shown when "factors other than race, such as *party politics* ...," were

42

driving the election results"). The Court concludes that minority preferred candidates can be more moderate than the average black Roman.

184. The Court, therefore, concludes that no hard and fast rule can be set forth defining who is truly a "black preferred candidate." Instead, the Court must carefully examine the candidacies at issue in order to determine if a fair interpretation of the evidence indicates that a particular candidate was "black preferred" or, alternatively, whether he was merely the best choice available from an unacceptable candidate pool. "Under such circumstances, the preference of the black electorate might be proved though the use of anecdotal testimonial evidence, polling data, a review of the appeals made during the campaign, and turnout information, indicating whether black voters were energized to support a particular white candidate." *Nipper,* 39 F.3d at 1540. This inquiry is somewhat subjective in that the Court is attempting to determine which candidates are sufficiently satisfactory to the minority as to be capable of being considered minority preferred. This approach, however, is consistent with the Supreme Court's admonition that "[i]n evaluating a statutory claim of vote dilution through districting, the trial court is to consider the totality of the circumstances and to determine, based upon a searching practical evaluation ..., whether the political process is equally open to minority voters." *Gingles,* 478 U.S. at 79, 106 S.Ct. at 2781 (citations and internal quotations omitted). In other words, scrutinizing electoral systems for Voting Rights Act violations is not an exact science.[9]

---

[9]For some of Rome's elections, the Court has little information with which to determine which candidates were truly black preferred other than voting statistics. To combat this problem, the Court has relied primarily on its comparison of the level of black support for candidates with whom the Court is unfamiliar and the level of black support for those candidates who the Court has determined are black preferred from the fact that they received the most black votes or other non-statistical evidence. For instance, if candidate X was white and received almost as much support from the black community as candidate Y who was black and was the leading vote getter in the black community, then the Court would deem both candidate X and Y to be black preferred. If candidate Z would have also been elected by the black community but received significantly less support than candidates X and Y, the Court would not conclude that candidate Z was black preferred.

The Court concludes that this mode of analysis allows the Court to accurately determine who is truly a black candidate of choice. Though the Court concludes that elections in which no black candidates participated ("white only elections") are

185. To begin, the Court examines the 1980 race for City Commission Ward 2. In the Democratic primary, the African-American community would have elected Mr. Fielder, Mr. Cofield and Mr. Caldwell. Mr. Fielder and Mr. Cofield are African-Americans who received high levels of black voter support. They will be considered black preferred candidates. 19% of all African-American registered voters supported Mr. Caldwell. This figure is greater than the percentage vote any candidate received from the white community and is substantially greater support than the black community gave to the fourth and fifth candidates in the race. The Court concludes, therefore, that Mr. Caldwell was also black preferred. Mr. Fielder and Mr. Caldwell won the primary, but Mr. Cofield was defeated. Mr. Fielder and Mr. Caldwell also won the general election. The Court concludes, therefore, that two out of three minority preferred candidates were successful in this election.

186. In the 1980 Board of Education race, the Court notes that 5 of the 6 candidates favored by the black community were elected including Mr. Carmichael—an African-American. The Court notes, furthermore, that the only candidate that the black community would have elected, but who lost, was the 5th choice of the black community. Under the Court's analysis, therefore, this candidate was not truly black preferred because he did not truly engender enthusiasm in the black community. The Court concludes that the only candidates who were truly strongly supported by the black community were Mr. Carmichael, Ms. Jones and Mr. Franklin. These candidates not only won the election, but were three of the four top vote getters. The Court concludes that all three black preferred candidates won this election.

---

theoretically subject to this same analysis, most such elections do not contain a candidate that the Court can be sure is minority preferred and who, consequently, can serve as a benchmark for measuring the level of black voter support that is a true indicator of other candidates who are black preferred. The Court also concludes that it need not analyze the instant white only elections to gain an accurate picture of the black community's ability to elect its preferred candidates. The instant white only elections serve solely to reinforce the lesson learned in the Court's analysis of black on white elections below: black preferred candidates who are white almost always win. The Court, therefore, will analyze white only elections no further.

44

187. In the 1984 Democratic Primary for City Commission Ward 2, Mr. Askew, Mr. Fielder and Mr. Fricks were favored by the black community. Mr. Askew and Mr. Fielder are black and received significant black voter support. The Court deems them black preferred. Mr. Fricks, however, received minimal black support and will not be so deemed. Mr. Fielder won and Mr. Askew lost. Mr. Fielder went on to win the general election. One out of two black preferred candidates won this race.

188. In the City Commission Ward 3 Democratic primary that year, Mr. Smith, Mr. Mitchell and Ms. Kennedy were favored by the black community. The Court heard evidence at trial that Ms. Kennedy has been a satisfactory representative of the black community. Mr. Smith is black and received significant support. The Court concludes that Mr. Smith and Ms. Kennedy were black preferred. Ms. Kennedy won, but Mr. Smith lost: one out of two black preferred candidates was successful.

189. In the 1984 Democratic primary for the Board of Education, Ms. Sims, Mr. Morrow, Ms. Jones, and Ms. Burk received significantly more support from the black community than any other candidates and will be deemed black preferred. Three of the four won the primary. Those same three went on to win the general election. Three of four black preferred candidates were successful.

190. The 1987 Ward 3 Democratic primary for City Commission is identical to the 1984 general election for this spot: again, one black preferred candidate won, and one lost.

191. In the 1988 general election for Board of Education, 6 of 7 candidates favored by the black community won. None of the six, moreover, received less than 18% of the vote of all registered African-Americans. To give the Plaintiffs the benefit of the doubt, the Court will not consider them all black preferred. The Court concludes that Ms. Sims, Mr. Holland, Mr. Bell, Ms. Jones and Ms. Burk were "black preferred." 4 of these 5 won.

192. In the 1989 Democratic Primary for City Commission Ward 2, Mr. Fielder and Mr. Holland were black preferred. One won, and one lost.

193. In the 1993 Democratic primary for the Board of Education, every candidate favored by the black community won. It is difficult, however, to determine who was truly black preferred. Ms. Sims, who is black, received significant black support: she was, accordingly, black preferred. The Court notes that there is no significant difference in the vote totals for Ms. Sims, Ms. Lightfoot, Mr. Clark. The Court, therefore, will deem all three black preferred. The Court notes, moreover, that Ms. Burk had received significant black support in the past.[10] The Court will, therefore, deem her black preferred as well. Mr. Swann had not received significant black support in the past and, therefore, will not be considered black preferred. To give Plaintiffs the benefit of the doubt, moreover, Mr. Greer and Mr. Horton will not be considered black preferred despite their respectable black vote count and Mr. Greer's respectable performance in the black community in the previous election. The Court's decision to deem these four candidates as black preferred is also bolstered by the fact that they were the four highest vote getters in the general election among African-Americans. All four of these black preferred candidates won the general election.

194. In the 1993 general election for City Commission Ward 2, Mr. Askew and Mr. Fielder were black preferred. Though Mr. Fricks received substantial black support, the Court will not consider him black preferred since he was the only other Democrat in the race and had not received substantial black support in the past. Mr. Fielder was elected, and Mr. Askew was defeated. One out of two black preferred candidates was elected.

195. In the 1995 general election for City Commission Ward 3, Mr. Williams and Mr. McClure were black candidates. Mr. Griffin received more black support than Mr. McClure. The Court concludes, therefore, that these three were black preferred. One of the three was elected.

---

[10]The Court also heard evidence from one of the *Plaintiffs* that Ms. Burk, Ms. Lightfoot and Ms. Clark are supported by the black community.

46

196. The Court, furthermore, concludes that Dr. Sam Burrell was a black preferred candidate. Dr. Burrell is an African-American who has been elected to the Floyd County Commission and whose election is probative of the electoral success of Rome's black community.[11]

197. The foregoing analysis reveals that even in elections in which black candidates ran, 23 of 33 black preferred candidates were elected.[12]  According to a strict count of the candidacies considered above, black preferred candidates are *usually* elected in Rome.  *Id.* at 49, 106 S.Ct. at 2766 (Section 2 violated when "a bloc voting majority [is] *usually* ... able to defeat candidates supported by a politically cohesive, geographically insular minority group.").[13]  Black preferred candidates, moreover, filled 45% (22/49) of the positions available in the races in which they ran. This, of course, is a higher percentage of positions filled than the percentage of Rome's population which is black.[14]

---

[11]Rome is located within Floyd County.

[12]To give Plaintiffs the benefit of the doubt, the Court has not counted Mr. David Shelley in this total.  Mr. Shelley is an African-American who was supported by the white community in Rome for county office.  His election is not particularly probative, however, because he ran against an opponent who was not considered to be a "friend of the city."  The Court has also excluded from the count the candidacy of Reverend Hill because the challenged electoral system is significantly different than when he ran.  Reverend Hill ran when the city had a majority vote requirement.  His defeat, therefore, is not probative of the inability of Rome's black community to defeat white bloc voting in a plurality system.  In fact, the election arguably shows that black candidates can win under Rome's plurality system since Reverend Hill won the initial election.

[13]To be thorough, the Court notes that some evidence was introduced of bloc voting in exogenous elections that the Court has not explicitly considered above.  The Court is aware of this evidence and has considered it.  The Court concludes, however, that in the instant case Rome's endogenous elections are more than sufficient to paint an accurate picture of Rome's voting habits.

[14]At various times, Plaintiffs have implied that Mr. Fielder and Ms. Sims are simply "Uncle Toms" who do not truly represent the black community.  The Court simply notes that this suggestion is undermined by the aforementioned election results.  Ms. Sims was favored over Plaintiff Morrow by *both* the black and white communities in 1984 when both initially ran for office.  Likewise, Mr. Fielder was favored over Plaintiff Askew by *both* the black and white communities when both ran for election as sitting members of the Commission in 1984.  This data does not suggest that Mr. Fielder and Ms. Sims are not true representatives of the black community.

198. Plaintiffs, however, argue that these numbers are misleading. First, Plaintiffs argue that many of the successful black candidacies above must be excluded from this count because their success was due to a "special circumstance." The "special circumstance" at issue is the fact that, with one exception, every black candidate to have been elected to either the City Commission or the Board of Education in Rome has been first appointed by sitting members of either the Commission or the Board to fill a vacancy on that body. Plaintiffs contend that these candidates' appointments constituted a "good housekeeping stamp of approval" from the white political elite in Rome. They contend that this stamp of approval enabled these black officials to overcome racial bias in the white electorate and to achieve electoral success that they would not have been able to otherwise achieve. They cite *Gingles* for the proposition that "the election of a few minority candidates does not necessarily foreclose the possibility of dilution of the black vote" and argue that the appointment process was simply an attempt by the white community to "manipulate[e] the election of ... "safe' minority candidate[s]." *Id.* at 75, 106 S.Ct. at 2779. They contend that the true political reality in Rome is that black candidates can almost never overcome racial bias in the electorate to win election when they have not been previously appointed, and, therefore, these appointed candidates should be excluded from the vote dilution count.

199. To begin its analysis of this theory, the Court concludes that none of the individual decisions to appoint African-Americans to the City Commission and Board of Education has been an attempt to avoid the reach of the Voting Rights Act or to manipulate the instant case in any way. The evidence indicates that Rome's elected officials were simply motivated by an appropriate desire to achieve racial diversity on Rome's elected bodies.

200. The Court concludes, however, that racism exists in Rome. This conclusion is justified by several facts. Among those that the Court considers probative are Rome's history of racial tension, the black community's continuing depressed socio-economic status and the fact that Rome continues to be a largely segregated society.

48

201. The Court concludes that racism in Rome is not explicit. No direct barriers to black voting exist. Some interracial neighborhoods and schools do exist. No evidence was presented of recent racially motivated confrontations between Rome's black and white citizens. Racism has become more rare and more subtle than in the past.

202. Given these facts, the Court must attempt to determine to what extent racism plays a role in the voting behavior of the Rome electorate. The Court is compelled to make clear that it does not understand the law to require Plaintiffs to prove racism determines the voting choices of the white electorate in order to succeed in a voting rights case. Neither the Supreme Court nor the Eleventh Circuit has ever held that such a showing is a necessary element of a vote dilution claim. *See id.* at 62, 106 S.Ct. at 2772 (plurality portion of majority opinion) ("For purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent. It means simply that the race of voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races ... vote in blocks for different candidates."); *Nipper,* 39 F.3d at 1524-25 (only 2 Judge portion of majority opinion holds that racism is necessary element); *but see also S.C.L.C.,* 56 F.3d at 1293-94 (*en banc* decision affirming district court decision that "factors other than race, such as party politics ..., were driving the election results and that racially polarized voting did not leave minorities with less" political opportunity. The Court understands this paragraph to signify that "race" must play a role in the defeat of black preferred candidates before the Voting Rights Act is violated, but racism in the electorate is only one of several roles that race may play.). The Court concludes, however, that it is necessary to evaluate the level of racism in the electorate in the instant case because without racism the fact that Mr. Fielder, Mr. Carmichael, and Mr. Burrell have been appointed is far less significant. True, appointments offer the advantage of incumbency, but that is essentially a publicity advantage that can be neutralized through hard work. *See Clarke v. City of Cincinnati,* 40 F.3d 807, 813 (6th Cir.1994) ("Plaintiffs assert that the special circumstance of incumbency explains away the success enjoyed by black candidates for City Commission because five of the eight blacks elected to the city council ... were first appointed to that

49

body.... But unlike other "special circumstances,' incumbency plays a significant role in the vast majority of American elections. To qualify as a "special' circumstance, then, incumbency must play an unusually important role in the election at issue; a contrary rule would confuse the ordinary with the special, and thus "make practically every American election a special circumstance'."), *cert. denied,* 514 U.S. 1109, 115 S.Ct. 1960, 131 L.Ed.2d 851 (1995). Incumbency is, moreover, far from a guarantee of electoral success, particularly in a multiple seat system in which candidates rarely run for reelection unopposed. Rather, the Court concludes that these appointments are primarily relevant for Plaintiffs' suggestion that they help to overcome racism in the white electorate. A determination of to what degree racism affects Rome's electoral choices is, therefore, probative of the size of the advantage given by these appointments. It is probative of what the true political reality is in Rome and whether these candidacies demonstrate that black Romans can elect their preferred candidates in the absence of appointment.

203. In 1970, the candidacy of Reverend Hill demonstrated that many of Rome's white voters were substantially motivated by racism. Reverend Hill, a popular black candidate, won the initial election against three white opponents. He was, however, subsequently defeated in a run off. More voters turned out for the runoff than turned out for the initial election. The Court concludes that they did so in order to defeat the first serious black candidacy in Rome's history.

204. Circumstances have, however, changed in the intervening period. Regardless of how they got their start, the fact remains that several black candidates have successfully garnered sustained biracial support in Rome. In fact, Mr. Fielder and, for the most part, Ms. Sims have received roughly as many white votes in their reelection bids as those white incumbents also running for reelection. The Court discerns from this information that racism does not affect voter behavior once voters become familiar with a candidate. The importance of interracial endorsements in Rome politics, however, demonstrates that racism does play a role in the electorate's view of new and unknown candidates for office. The Court concludes, therefore, that racism does affect a portion of the electorate when the voters are unfamiliar with a candidate of the opposite race, but that it is

50

a relatively inconsequential factor once a candidate becomes familiar to the electorate through either serious campaigning, interracial endorsements, or incumbency. At that point, ideology and other legitimate voting criteria predominate in the minds of Rome's white voters.[15]

205. The question, then, is whether these circumstances justify discounting the success of minority preferred candidates like Mr. Fielder. The answer is that they do not. Though racism in *any* form or degree is morally unacceptable, racism in Rome's electorate has declined to the point where its impact may be overcome through hard work, political savvy and a willingness to compromise. The key to eliminating the effects of racism in Rome is voter familiarity with the candidate. The Court, therefore, cannot say that those black candidates who have not been elected were defeated by racism. Mr. Askew, after all, was defeated despite an appointment while Ms. Sims was elected without one. Those black candidates who were unsuccessful were defeated by other non-racial factors such as the failure to campaign hard with the intent to form a biracial coalition. *See S.C.L.C.,* 56 F.3d at 1293-94 (*en banc* decision affirming district court's finding of no vote dilution when "factors other than race, such as ... [the] availability of qualified candidates, were driving the election results."). Testimony at trial revealed that those candidates who lost placed emphasis in their campaigns on signs and posters, while those candidates who won relied on a far more effective asset: "shoe leather." The record reflects, for instance, that Mr. Holland did not "run hard" in his two races.[16] Mr. Askew, who also accounted for two races, is articulate and bright, but the Court concludes that he did not campaign hard in the white community. Mr. Askew, moreover, testified to a principled unwillingness to compromise:

---

[15]The Court finds it quite ironic that this racist hesitancy to vote across racial lines, which results quite naturally from the interracial ignorance bred by a segregated society, is now being put forth as justification for effectively segregating Rome's governing bodies.

[16]The Court anticipates that Plaintiffs might argue that this finding is inaccurate or irrelevant since Mr. Holland obviously ran hard enough to garner the votes of a substantial number of black voters. The Court concludes, however, that the black community is sufficiently cohesive that it will vote in large numbers for almost any reputable black candidate. Plaintiffs, in fact, have admitted as much. Thus, the fact that Mr. Holland received black voter support does not indicate that he put forth sufficient effort to become known in the white community.

51

A. [Black Romans] have seen what happens in this community when someone stands up. That's why Mr. Fielder sits down and doesn't address black issues. That's why Ms. Sims doesn't address black issues, because if they did, they wouldn't be there anymore.

...

Q. You know that politics is a compromise situation everywhere, isn't it?

A. I don't compromise my integrity, Mr. Brinson.

...

Q. Don't you think that you have to pull, and tug, and bargain, and give up, some give and take?

A. But you've got to stand up, Mr. Brinson, you've got to stand up.

...

A. You can't lay down, let people run over you and that's basically what happens in [the black] community, because we feel like we have no other hope.

...

A. [I]f *my* people turn out, then *your* people turn out. And if *your* people turn out, I can't win.

While principled politicians are a rare and noble breed, the issue before the Court is whether it was racism or, alternatively, ideology that determined Mr. Askew's electoral fate. The aforementioned testimony reveals that Mr. Askew views the black and white communities as at odds with each other. The Court concludes, therefore, that his defeat was a result of his ideology, not the color of his skin. The Court, therefore, will not characterize Mr. Fielder, Mr. Carmichael and others as being exceptions to the political reality.[17] They are not products of a "good housekeeping stamp of approval."[18] Rather, they are products of Rome's racial progress and reflection of the fact that

---

[17]Excluding from the count the candidacies of all initially appointed black officials, 4 of 12 black candidacies have been successful if the count includes Mr. Shelley. Thus the success rate of black candidates is roughly proportional to the percentage of Rome's population that is black. Such a ratio implies that if more black candidates ran, black candidates would fill the same percentage of seats on Rome's governing bodies as the percentage of Rome's population that is black.

[18]The Court is aware that some courts have taken a different view of the electoral success of black candidates who were first appointed. These courts have concluded that the success of these black candidates was the result of "special circumstances" and, therefore, not probative of

biracial coalitions are possible in Rome for both black and white candidates. Though it is irrelevant to the Court's analysis, they are also examples of everything that the Voting Rights Act and other civil rights laws have attempted to foster.

206. Second, Plaintiffs may find fault with the aforementioned analysis in that it fails to account for those black candidates who have not run for office because they believed they could not win. The Court recognizes the argument could be made, therefore, that had they run and lost, black preferred candidates would have usually been defeated by a white bloc voting majority. The Court concludes that some black candidates do believe that they are unable to win in the absence of an appointment. The Court, however, concludes that they are wrong. The sustained success of Rome's black office holders indicates that qualified black candidates can win if they campaign hard with the intent to form biracial coalitions.[19]

207. Third, the Court also anticipates that Plaintiffs may find fault with the Court's analysis because in every one of the successful black preferred candidacies counted above, the white community would have elected the black preferred candidate on its own. These, therefore, are not "split preference" elections. Two Eleventh Circuit Judges have held elections such as these to be "of relatively little use in evaluating the power of white bloc voting." *Nipper,* 39 F.3d at 1494.

208. This statement is undoubtedly true. An examination of only those races in which black preferred candidates would not have been elected by the white majority if they alone had voted

whether blacks can elect candidates of their choice. The essential distinction between those cases and the instant one, however, is that in those cases there was no evidence that the appointed candidates had been able to develop sustained biracial coalitions. Instead, the candidates were able to maintain their elected positions because of the sheer power of incumbency: often running unopposed for reelection. The Court would agree that those candidates were not probative of the ability of blacks to elect candidates of their choice. The Court, however, concludes that the instant case is distinct from those cases because the ability of both black and white candidates to form sustained biracial coalitions in this case is clear. *See, e.g., United States v. Marengo County Commission,* 731 F.2d 1546, 1572 (11th Cir.1984), *cert. denied* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984) (One black official was appointed and unopposed for reelection. One other black candidate was elected without appointment and then reelected without opposition. 72 other black candidacies were unsuccessful).

[19]This may necessarily entail taking more moderate positions than the majority of the black electorate would like.

reveals that none of these black preferred candidates was elected. In all ten of these elections, black preferred candidates, who were black, lost. This is a powerful statement: it is, however, misleading. It demonstrates the power of the white vote to defeat black preferred candidates who are black, but it says nothing about their willingness to do so.[20] It says nothing about the degree of racial polarization that exists in Rome because it makes no reference to the many candidates upon whom the races agreed. It demonstrates bloc voting, but it says nothing about the severity of that bloc voting. The Court, therefore, will not consider only those black preferred candidacies in which there is a "split preference," because doing so does not answer the question of whether white bloc voting usually defeats black preferred candidates. *Gingles,* 478 U.S. at 48, 106 S.Ct. at 2765 ("The theoretical basis for this type of impairment is that where minority and majority voters *consistently* prefer different candidates, the majority, by virtue of is numerical superiority, will regularly defeat the choices of minority voters.").

209. Finally, in the alternative to their hypothesis that black candidates' electoral successes have been due to a "good housekeeping stamp of approval," Plaintiffs advance another novel theory. Plaintiffs contend that even if the white electorate is willing to elect one "token" African-American to each governing body, they are not willing to elect two. Plaintiffs contend, therefore, that the Court should ignore the electoral success of Mr. Fielder, Ms. Sims and Mr. Carmichael and conclude that Section 2 is violated because black candidates cannot win two seats. The Court concludes, however, that this theory is frivolous.

210. Plaintiffs' theory implies that there is some sort of active conspiracy among the white electorate to allow the black community a token representative, but no more. Plaintiffs, however, have produced no evidence of such a sinister plot. If Plaintiffs do not mean to suggest that such a conspiracy exists, then their theory presupposes a unique racist psychological phenomenon among the white electorate by which they will put aside their racism for one candidate while simultaneously

---

[20]For instance, it ignores the elections of Mr. Fielder, Mr. Carmichael, Ms. Sims and Mr. Burrell.

bigotedly voting against all other black candidates. Plaintiffs have simply produced no evidence of this type of voting phenomenon, and their theory defies common sense.

211. The Court, therefore, remains convinced that Rome is not sufficiently racially polarized to warrant the conclusion that the Voting Rights Act has been violated. Rome's white electorate simply does not "*usually* ... defeat candidates supported by a politically cohesive, geographically insular minority group." *Id.* at 49, 106 S.Ct. at 2766.

iii. Other Factors

212. Plaintiffs have failed to prove one of the essential elements of their claim. They cannot, therefore, show that under the "totality of the circumstances" their votes have been diluted. To be thorough, however, the Court will continue its analysis. The Court concludes below that the balance of the other factors relevant to Plaintiffs' claim also support the conclusion that Defendants' electoral systems are not diluting Plaintiffs' votes.

213. Weighing in Plaintiffs' favor is the fact that Rome's black community "bear[s] the effects of discrimination in such areas as education [and] employment ..., which hinder their ability to participate effectively in the political process." *Id.* at 37, 106 S.Ct. at 2759; *Marengo County Commission,* 731 F.2d at 1567 ("Past discrimination may cause blacks to register or vote in lower numbers than whites. Past discrimination may also lead to present socioeconomic disadvantages, which in turn can reduce participation and influence in political affairs."). Until 1972, Rome's school systems were segregated. As a result, Rome's black population is, as a whole, less educated and less wealthy than Rome's white community. Less educated populaces are likely to be less interested in policy debates and less likely to effectively advocate for their needs. Accordingly, such populaces are at a disadvantage when forced to compete against better educated majorities in the delicate and complicated game of choosing elected officials. Rome's at-large electoral systems, moreover, have the effect of increasing the importance of money in the electoral process by enlarging the electoral district. At-large systems, therefore, also hurt minority populaces, such as Rome's black community, that are less wealthy than majority populaces. The Court concludes,

55

however, that these factors are mitigated somewhat by the fact that the socio-economic disparities between the races are not as great in Rome as they are in some other communities.

214. Also weighing in Plaintiffs' favor is the fact that Rome "has used majority vote requirements" in the past and continues to word its ballots in such a way that single shot voting is discouraged.[21] The Supreme Court has recognized that these "procedures ... enhance the opportunity for discrimination against the minority group" and are, therefore, relevant to the dilution inquiry. *Gingles,* 478 U.S. at 37, 106 S.Ct. at 2759. The Court concludes, however, that these factors are of diminished importance in the instant case because the majority vote practice has been abolished and was not found to have been implemented for a discriminatory purpose. *See City of Rome v. United States,* 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). There is, furthermore, no official anti-single shot policy. These factors, therefore, are not particularly probative of current racial bias in Rome. Most voters, moreover, that are sophisticated enough to understand the power of single shot voting will also understand that it is permissible.

215. The Court also concludes that candidates for city office in Rome have at times formed informal alliances and these alliances have failed to include black candidates. *Gingles,* 478 U.S. at 37, 106 S.Ct. at 2759 (relevant factors include "if there is a candidate slating process, whether the members of the minority group have been denied access to that process"). Again, however, this factor is mitigated by the fact that this practice has been infrequent and was not sanctioned by any formal political party. In a multi-seat voting system such as Rome's where everyone competes against everyone else for votes, slating is naturally going to be a rarely utilized practice.

---

[21]Throughout this case Plaintiffs have contended that the combination of Rome's residency wards and staggered terms for City Commissioners is dilutive. This is allegedly so, because these practices have the effect of separating elections and thereby decreasing the effectiveness of single shot voting. The Court simply notes the combination of these methods is no more detrimental to single shot voting than the use of residency wards without staggered terms. The same number of ward elections will be held whether they are all held in the same year or whether each ward's commissioners are elected at different times. Rome's staggering of terms may have some effect on voter turnout, but the practice is irrelevant to the effectiveness of single shot voting in a residency ward system.

216. On the other hand, Defendants' case is supported by the fact that Rome's political campaigns "have not been characterized by overt or subtle racial appeals." *Id.* In fact, just the opposite is true. The testimony from active Rome politicians revealed that white politicians actively seek support from the black community and seek endorsements from black leaders.

217. Plaintiffs, moreover, have made no attempt to prove that there is a "significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the black community." *Id.* Once again, just the opposite is true. Both voting statistics and testimonial evidence conclusively reveal that Rome's black community has political influence.[22] This political influence naturally translates into political responsiveness.

218. Finally, the Court concludes that the policy underlying Rome's electoral methods is not tenuous. *Id.* Rome's electoral system is grounded in the belief that at-large elections produce candidates that are responsive to the whole electorate, rather than a geographical faction. Residency wards temper this system by ensuring that Rome's governing bodies are familiar with all areas of the City. The Court need not determine whether this system represents Rome's political paradigm: it is enough to conclude that the justification for Rome's system is not "tenuous." Accordingly, the systems do not, in and of themselves, support the inference that they are maintained for a discriminatory purpose or that Rome's electorate is racially biased.

219. In brief, though the Court considers the depressed socio-economic status of Rome's African-American community to be evidence of dilution, the Court is most impressed by the fact

---

[22]For instance, in the 1980 Ward 1 general election, white voters favored Morris and Callan, but both lost to the black favored candidates Hanson and Pullen. In the 1980 Board of Education general election, white voters would have elected Clark but black favored candidate Jones won election instead.

The Court also notes Defendants' expert's analysis indicates that white favored candidate Burnes was defeated in the 1988 Board of Education race. His analysis indicates that white favored candidate Norman was defeated in the 1993 Ward 2 City Council race. His analysis also indicates that in the 1993 Board of Education race white favored candidate Horton was defeated. Plaintiffs' expert's analysis in each of these last three races either contradicts Defendants' expert's conclusions or is inconclusive. The Court, therefore, simply notes the possibility that these latter white candidates may have also been defeated despite being favored by the white community.

that Rome's white candidates actively seek the black vote and are responsive to the black community's needs. One of the theoretical foundations of Justice Brennan's interpretation of the Voting Rights Act in *Gingles* was the fact that racial bloc voting not only "deprive[s] minority voters of their preferred representative[, but] also allows those elected to ignore [minority] interests without fear of political consequences, leaving the minority effectively unrepresented." *Id.* at 48 n. 14, 106 S.Ct. at 2765 n. 14 (citations and internal quotations omitted). Such is not the case in Rome. On balance, therefore, the Court concludes that these *Gingles* factors support a finding that Plaintiffs have not been denied equal electoral opportunity.[23]

iv. Summary

220. The Court, above, reaches several conclusions which bear repeating here. First, the Court concludes that a certain degree of racism exists in a portion of Rome's white electorate which causes them to hesitate to vote for black candidates with which they are unfamiliar. Second, the Court concludes that Rome's African-Americans are somewhat less able to elect candidates of their choice than white Romans because they are somewhat poorer, less educated and less politically involved than the white community due in part to the effects of past racial discrimination. Third, the Court concludes that racism is of minimal significance once the electorate becomes familiar with a black candidate: ideology, character and other legitimate voting criteria determine voting preferences at this point. Fourth, the Court concludes that both black and white candidates can form biracial coalitions in Rome which result in the election of black preferred candidates who are both

---

[23]The Court is aware that "the extent of any history of official discrimination in ... the political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process" is also a factor to be considered in the vote dilution determination. *Id.* at 36, 106 S.Ct. at 2759. The Court is also aware that in the 1950's Georgia enacted legislation requiring all election officials to purge voter lists, conduct voter registration only at specifically designated stationary locations, and impose a voter registration requirement of passing a literacy test or test of "good character." The Court is aware that the Georgia Constitution of 1976 carried forward the literacy test combined with a "good character and understand[ing]" test, and that all of the aforementioned laws were applicable to Rome election officials. The Court concludes, however, that this factor is of little consequence in the instant case since the City of Rome itself did not take these discriminatory actions and they have been abolished.

black and white. Finally, the Court concludes that black voters exert considerable influence over city campaigns: in fact, every black preferred white candidate to have run for either the City Commission or the Board of Education since 1980 has been elected.

221. Under these circumstances, the Court has concluded that an insufficient amount of white bloc voting exists to deprive Rome's black community of an equal opportunity to elect candidates of their choice. This conclusion is bolstered by an examination of the other factors relevant to the vote dilution determination. The parties have ably demonstrated that a variety of policy arguments can be made both for and against at-large voting systems. In the words of Justice Stevens, however, "[i]t is, of course, irrelevant whether we, as judges, deem it wise policy to create majority-minority districts as a means of assuring fair and effective representation to minority voters." *Shaw,* --- U.S. ----, 116 S.Ct. 1894, 135 L.Ed.2d 207 (Stevens, J., dissenting). The Court's duty is simply to carry out the will of Congress as interpreted by the Supreme Court and the Eleventh Circuit. This it has done: no more and no less. In the totality of the circumstances, the Court concludes that Plaintiffs have not been denied equal electoral opportunity by Rome's method of electing its City Commission and its Board of Education. 42 U.S.C. § 1973.

III. Conclusion

Accordingly, the Court finds for the Defendants and against the Plaintiffs on all claims.

IT IS SO ORDERED, this the 25th day of June, 1996.